# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

Merchants' & Manufacturers' National Bank of Pittsburg *v.* The William A. Baeder Glue Co. and L. C. Haughey, Defendants, and William H. Kern, Garnishee.

Appeal of Gilpin, Exr. of W. H. Kern, dec'd.

*Attachment execution—Goods outside of state.*

While an attachment execution served on a garnishee in Pennsylvania cannot bind defendant's goods in the hands of the garnishee in another state, it will, if the goods have been sold, bind the proceeds in the garnishee's possession.

*Account—Collaterals—Fraud—Waiver—Creditors.*

Where goods deposited with a creditor as collateral security for a debt have been sold, the debtor cannot collusively waive his right to an account from the creditor, so as to defeat the right of his attaching creditors to require an account from the creditor of the proceeds of the sale.

The holder of collateral securities, with power to sell them for his debt, is not bound to obtain the highest possible price for them, but he is bound to the exercise of common prudence and good faith in his management and conversion of them; and while the debtor may acquiesce in or assent to fraudulent conduct, so far as concerns himself, he cannot bind his creditors by such acquiescence or consent.

*Partnership—Settlement of prosecution—Evidence.*

Where a partner who acts as prosecutor of a person who has embezzled money of the firm, settles the prosecution, and receives money therefor, the presumption is that the money is received on behalf of the

firm, and the partner cannot be heard to allege that the money was paid
to him individually as a bribe to stop the prosecution.

Mr. Justice Mitchell dissented.

Argued March 28, 1894. Appeal, No. 248, Jan. T., 1894, by
Hood Gilpin, executor of William H. Kern, deceased, from
judgment of C. P. No. 2, Phila. Co., March T., 1890, No. 440,
on verdict for plaintiff. Before Green, Williams, McCol-
lum, Mitchell and Fell, JJ. Affirmed.

Attachment execution. Before Fell, J.

At the trial it appeared that, on March 27, 1890, plaintiff ob-
tained judgment against the William A. Baeder Glue Co. for
$9,980.55. The glue company was a partnership composed of
William A. Baeder, Howard R. Kern and Louis C. Haughey.
William H. Kern, the father of Howard R. Kern, had loaned
money to the firm, for which he held its notes to the amount of
$12,000, and had indorsed for them to the amount of $14,721.87,
for which he held paper made or indorsed by the firm, none of
which would mature prior to March 21, 1890. H. R. Kern
then delivered to W. H. Kern a promissory note of the firm for
$6,000, dated Jan. 11, 1890, at thirty days; a promissory
note, signed by J. D. Hall & Co., of which H. R. Kern was a
member, for $3,346, to the order of the W. A. Baeder Glue
Co., dated Jan. 20, 1890, payable at four months, which he in-
dorsed to W. H. Kern, and a promissory note of Schimpf &
Richards to the order of the W. A. Baeder Glue Co., dated
Jan. 21, 1890, for $2,500, at four months. It was claimed by
plaintiff here that these three notes were conveyed to W. H.
Kern for the purpose of defrauding the firm by increasing the
apparent claim from $26,721.87 to $38,567.87. It appeared
that H. R. Kern was individually indebted to his father in a
large amount. On March 2, 1890, Baeder and H. R. Kern de-
livered to W. H. Kern, as collateral security for the firm debt,
personal property, including 2198 barrels of glue stored in New
York, for some of which the latter had received warehouse re-
ceipts in 1889.

H. R. Kern and W. H. Kern agreed that, for the purpose of
obtaining judgment, all the paper held by W. H. Kern should
be considered as if it were due, and suit was brought by W. H.

Kern against the William A. Baeder Glue Co., in the Supreme Court of New York, Feb. 20, 1890, and on March 12, 1890, judgment was obtained for $38,900, and execution issued.

While this suit was pending, on March 6, 1890, the W. A. Baeder Glue Co. withdrew its bank deposits, aggregating $4,600, and placed the money with W. H. Kern, who afterward paid it out at the direction of H. R. Kern.

About March 4, 1890, H. R. Kern went to Pittsburg and saw his partner, Louis C. Haughey, and not informing him of the fact that suit was then pending in New York by W. H. Kern against the firm and that judgment would be obtained within a few days and execution issued, urged him to obtain money to make good his capital in the W. A. Baeder Glue Co. At this time a Miss Mary C. Raridan, a relative of Haughey, was an inmate of Haughey's home in Pittsburg. She owned forty-four shares of the capital stock of the Indianapolis National Bank, worth about $4,400. At the solicitation of Kern and Haughey she agreed to loan this stock to them to be used for the purpose of obtaining money for the use of the firm, and gave them an order on a relative in Indianapolis for the stock. H. R. Kern then at once went to Indianapolis, taking Haughey with him, and by like representations obtained the forty-four shares of stock and also $14,996.18 of promissory notes of the Indianapolis Glue Company from Haughey's father. H. R. Kern then returned from Indianapolis to Philadelphia and delivered to W. H. Kern this bank stock and the promissory notes which had been obtained from Haughey's aunt and father to assist the firm, and returned to Pittsburg, where he arrived March 10, 1890, and entered of record two confessed judgments in favor of W. H. Kern, one of them signed " The William A. Baeder Glue Company, by H. R. Kern," for $26,721.87, and the other dated Jan. 6, 1890, signed by each of the three partners, " William A. Baeder, H. R. Kern, L. C. Haughey," for $26,721.87. At the same time H. R. Kern entered a judgment in favor of Emily L. Bentz, an inmate of his house and the guardian of his minor children.

In addition to the stock of glue in the New York store, the W. A. Baeder Glue Co. had more than 2200 barrels of glue stored in New York warehouses, which was not levied on.

Sixty barrels of this glue were stored with Elliott F. Driggs

& Co., of New York, and 2209 barrels were stored in the warehouse of Baker & Williams, New York city. When the glue was originally stored, negotiable warehouse receipts were issued for it to the W. A. Baeder Glue Co., and these receipts were delivered to W. H. Kern, in December, 1889, as collateral security for his claim against the W. A. Baeder Glue Co. On March 26, 1890, some of these receipts were returned to the warehouse by some one claiming the glue in the name of W. H. Kern and exchanged for negotiable receipts issued in the name of William H. Nagle, and the receipts were delivered to H. R. Kern representing W. H. Kern, and on the same day H. R. Kern wrote to William H. Nagle inclosing him receipts for 1370 barrels of glue, and requesting him to indorse the receipts and return them to him at once. Later on the same day Howard R. Kern wrote a letter to William H. Nagle as follows:

" I have this day put in your name about 2000 barrels of glue that did belong to William H. Kern, who sold them to you for 24,000, and I will sell them as your agent. I will see you on my return, but tell them you understand the affair; you paid $24,000 for this glue."

Nagle refused to have anything to do with the matter, and returned the warehouse receipts to H. R. Kern on Saturday, March 29, 1890. On March 31, 1890, these receipts were returned to the warehouse of Baker & Williams by H. R. Kern, representing W. H. Kern, accompanied by a letter from W. H. Kern to Baker & Williams, dated March 28, 1890, requesting that new receipts be issued in the name of James E. Salter for the glue, and saying: " You will please transfer the six warehouse receipts that stand in my name, and also the negotiable receipts that I had put into name of Wm. H. Nagle put also in the name of John E. Salter. Mr. Nagle did not come up to his bargain, so that I now want all the glue that you have, both W. H. K. and W. H. N., put into James E. Salter. Any other arrangement that is necessary to be done I appoint my son H. R. Kern my agent with power to act."

Warehouse receipts were thereupon issued in the name of James E. Salter for all of the 2209 barrels of glue. The only consideration for the sale to Salter attempted to be shown was a due bill for $24,000 which was not produced, it being alleged

that it was destroyed.  Salter testified that he paid this $24,000 in three payments of $5,000 each and one of $9,000.

The Acme Glue Co. was incorporated April 30, 1890, with an authorized capital of $20,000, and with a cash capital of $1,000, and of the one hundred and fifty-four shares of stock issued one share each was issued to John B. Dolan and Vincent B. Dolan, former clerks of the W. A. Baeder Glue Co., and afterwards clerks of the Acme Glue Co., twenty-four shares to Walter R. Kern, a son of W. H. Kern, and one hundred and twenty-eight shares to Emily L. Bentz, H. R. Kern's house-keeper.  The one hundred and twenty-eight shares issued to Emily L. Bentz were afterwards transferred to Samuel K. Pearce, a nephew of W. H. Kern, without Pearce's knowledge, and Pearce, at the direction of W. H. Kern, executed the transfer of these one hundred and twenty-eight shares of stock in blank and delivered it to H. R. Kern.

Immediately after the incorporation of the Acme Glue Co., H. R. Kern, in his capacity of general manager of it, bought from himself, as agent for Salter, the 2209 barrels of glue, claiming to have paid $32,000 for it, and the glue was from time to time sold and converted into money and passed into the pockets of the Kerns.  The actual quantity of this glue was 2209 barrels, weighing 433,259 pounds.  The market value of it, according to the testimony of Louis C. Haughey, was, in March and April, 1890, $50,558, and at a meeting of the W. A. Baeder Glue Co., March 19, 1890, it was stated by the firm to be worth $57,500, and in April, 1890, Howard R. Kern refused an offer of between forty and forty-five thousand dollars for it, made by the D. W. King Glue Co. of Boston.

The attachment in execution in this cause was served on W. H. Kern, March 27, 1890.

In 1891, H. R. Kern prosecuted L. C. Haughey on the charge of embezzling the money of the firm.  The prosecution was settled for $3,850, which was paid over to W. H. Kern.

Thomas W. Barlow, a witness for the plaintiff, was asked: " Q. Did you have any conversations with Mr. Howard R. Kern in reference to some Indianapolis bank stock belonging to Mrs. Raridan, and also in reference to some glue which had been alleged to be sold to William H. Nagle?  (Objected to.)  A. I had but one conversation that I remember at my office.  Q. When

was that conversation? (Objected to.) Mr. Todd: I propose to connect with letters we shall offer at or prior to the pretended sale, that there had been an effort to get rid of the forty-four shares of Indianapolis bank stock that Mr. Kern said he had received, and an effort to get rid of twenty-two hundred barrels of glue through a sale to Nagle, which Nagle refused to be a party to. I propose to go further and show when this came out that Howard Kern, who was authorized by his father to act, and who had power to act in every instance, and who was his agent, as the testimony shows .he was authorized by his father to act, early in January they had agreed to put in suit in another county some $11,000 or $12,000 of obligations which were not firm obligations and not a firm debt. That we have already shown enough to authorize giving in evidence the particular acts of the different parties to the transfer of this property from the creditors of the firm for the benefit of different persons. The particular matter I want to show by Mr. Barlow is the custody of these letters, the fact of Howard R. Kern's interview with Mr. Barlow in which he spoke about the transfer of this stock, and how that stock came to be transferred, and where it went to, that Mr. Kern said he got as part of his debt about the 14th of January.

" Mr. Johnson objects to any conversation with Howard R. Kern concerning any Indianapolis bank stock. Objection overruled. Exception for defendants.

" Q. State what you know. A. I don't remember that Howard R. Kern brought the bank stock to the office. My recollection is Nagle brought the bank stock to the office with a promissory note, a copy of which is in that paper. (Indicating.) Q. Will you identify this? A. Two certificates of bank stock were brought to the office by Nagle with a promissory note. That promissory note had been antedated Nov. 7, 1889, for the sum of $4,350:

" ' PHILADELPHIA, Nov. 7, 1889.

" ' Three months after date I promise to pay to the order of William H. Nagle $4,350, at 210 North Thirty-sixth street, without defalcation. Value received. (Signed) H. R. Kern.'

" With that were two certificates of stock of the Indianapolis National Bank and a letter—shall I read it? With the heading of William A. Baeder Glue Company, dated New York, March 14, 1890:

" ' DEAR BILL: Enclosed find note for $4,350.   This will cover the bank stock I sold you.   If anybody should ask you about this affair just say I owe you this amount and gave you the stock in payment and the affair will go through.   (Signed) Howard.'

" Q. What was your interview with Howard Kern ?   A. My recollection is my interview was subsequent to another transaction when he came in for these letters.   He came in for the letters that were brought in subsequently by Nagle with reference to the glue matter.   Q. You got the other letters ?   A. I may be in error about that.   He came in possibly for the stock. At all events he called in for whatever I had in my possession. I had the bank stock in my possession which I proposed to deliver to him and these letters and the promissory notes." [1]

Barlow also testified as follows: " A. I also refused to permit Nagle to keep the warehouse receipts, and instructed him to return them to Howard R. Kern.   I never had an interview with William H. Kern, nor did I ever know William H. Kern in this transaction except as to the signature on this letter of Mr. Gilpin in reference to the stock.   As I have said before, subsequently to that Mr. Nagle asked me to return the letters. I advised him not to do it.   Then Howard Kern came in and after a conversation——Q. State what it was as near as you can recollect—the exact words if you can.   A. I denounced the transaction——(Mr. Johnson objects to the conversation.)   The court will allow you to say what was done.   Q. When was the date that took place ?   A. It was the year afterward.   Q. That would be in 1891 ?   A. It must have been in 1891.   Q. Your certificate shows ?   A. It was prior to this, prior to the date of this certificate—the notarial certificate of the 24th of February, 1892.   We did not decide finally to return the letters until subsequent to the interview.   Q. Howard Kern came over to get hold of these letters and get them back from you ? A. Yes, sir.   Q. He came with William H. Nagle ?   (Mr. Johnson objects to any subsequent statement with Howard R. Kern concerning the getting of these letters.)   Mr. Todd: I propose to show he had come with Nagle and got Nagle to try to get these papers out of his possession, knowing they were dangerous papers.   (Objected to, objection overruled, exception for defendant.)   Q. Mr. Kern and Mr. Nagle came to your

office? A. Mr. Kern and Mr. Nagle came to the office. Mr. Kern urged me to return the letters to him. I declined. He became angry and we had some unpleasant words together. I think I called him a thief, and he probably made some remark to me; I do not know what it was; I can't remember. I remember mine to him, and then he left. Q. He did not get the papers? A. He did not; not then. Q. What did he say as to the ownership of those papers—on the subject of the ownership of them—to Mr. Nagle or to you? A. He said that they were Mr. Nagle's papers; that I had no right to keep them; that Mr. Nagle wanted me to give them to him, or something of that nature." [2]

Wm. H. Nagle testified under objection and exception: " Q. State when it was you first had any conversation with Howard R. Kern in reference to some forty-four shares of bank stock which were in the name of, or belonged to, Mrs. Raridan, of Indianapolis. (Objection to conversations with Howard R. Kern concerning the bank stock. Exception for defendant.) A. On a Sunday night, in March, 1890—I don't remember the day of the month—Mr. Howard Kern came to my house and told me the concern—the glue company—had failed, and that Louis Haughey had wrecked the concern, and he asked me if I would have placed in my name this bank stock—forty-four shares of bank stock. I told him I would if it was all right. He told me to go up to my counsel and have it transferred in my name. I gave it to my counsel." [3]

Samuel K. Pearce testified under objection and exception : " Q. It has been testified in this case, you were owner of one hundred and twenty-eight shares in the Acme Glue Company; is that correct or not? A.. I never owned any stock of the Acme Glue Company. (Objected to any questions as to the Acme Glue Company.) Mr. Todd: I offer it for the purpose of showing who were the stockholders of this company, and that this identical glue went from Mr. Kern, and that Howard R. Kern was the superintendent of the company, and that it is precisely Howard R. Kern in another name. (Objected to. Objection overruled. Exception for defendant.) A. I never owned any stock in the Acme Glue Company; it had been placed in my name without my knowledge. The certificate was brought to me by Howard R. Kern, and, at his request,

after I had seen William H. Kern in regard to it, William H. Kern directed me to sign the certificate as Howard requested. I did so and handed it back to Howard Kern. Q. When did this take place? A. I think that was in the month of March, 1891. Q. That was when you transferred this stock? A. I signed the power of attorney on the back of the certificate in blank. Q. Howard R. Kern brought it to you? A. Yes, in person. Q. When did you first learn he had stock in the Acme Company? A. That is the first knowledge I had of it. Q. Then you declined to sign the transfer? A. Until I had interviewed William H. Kern. Q. Where did that interview take place? A. In the People's Bank. Q. State what took place between you and your uncle? A. ' Uncle, Howard asked me to sign the certificate of stock in the Acme Glue Co.; what shall I do about it?' He said, ' That's all right; just sign it and give it to him.'" [4]

The witness further testified: " Q. Did you receive any bills from any one against the Acme Glue Company for glue? A. I received a number of communications from Howard R. Kern. Q. Have you got them there? A. I have. Q. Will you please produce them? (Same produced. Mr. Johnson objects to communications from Howard R. Kern concerning the Acme Glue Company. Objection overruled. Exception for defendant.) A. I find a communication I received from Howard R. Kern, dated December 21, 1891. It reads as follows:

"December 21, 1890.

"'Mr. Samuel K. Pearce, Philadelphia, Pa.

"' DEAR SIR: I enclose you a bill which I would like you to copy in your handwriting just as it is, and send it over to New York, directed to the Acme Glue Company, 283 Pearl st., N. Y., P. O. Box 2114. I will see you later in the coming week and explain the transaction. I will be at the People's Bank the next Friday, December 26th. Yours, H. R. Kern.'

" That is the first knowledge I had that any glue transaction had been made out in my name. Q. Have you the bill there? A. I have. Q. Produce it." [5]

The court charged in part as follows:

" As to the amount due by the glue company to W. H. Kern at the time of its failure it is conceded that there are over $26,000; he obtained a judgment for over $38,000, the differ-

ence being about $12,000. . . . As to this contention, gentlemen, the real question is, were these notes (representing this $12,000) firm obligations ? Mr. Kern himself could not make them such. If the loan was originally made to him, and afterwards assumed as a firm debt by the copartners, it became binding upon the firm. They have the right to assume them. If they were not so assumed they remained the individual debts of Howard R. Kern.

" Another question is as to the price for which the glue was sold, in March, 1890. On behalf of the plaintiff the witnesses have testified—two witnesses who were engaged in the business at Boston—testified that glue at that time was worth in large quantities about eight cents a pound; that they were offered a quantity of glue which they thought was considerably in excess of two thousand barrels ; that they examined this glue and made an offer ranging from $40,000 to $45,000 ; that this offer was made to Mr. Cummings, who was acting for Howard R. Kern, and they had no relation at all with William H. Kern, and had never seen him in connection with it.

" Upon the part of the defence it has been shown that the Fulton and Market Bank which held 360 barrels of this glue, upon the same condition that Mr. Kern held it, sold their glue, sometime after Mr. Kern was said to have sold his, at eight cents a pound; that at a sheriff's sale in New York city it brought four and one half cents a pound. The sale by Mr. Kern was for a little less than six cents a pound net. It was subject to the warehouse charges at that time and was sold without the payment of any commission by him. Howard R. Kern has testified in that connection, just before the sale of this glue he was asked by his father what it was worth. He told him it would be well sold if he got $24,000 for it. Howard R. Kern at that time represented the owners of the glue, The Baeder Glue Company, subject to the claim that William H. Kern had upon it. If he made such a statement at that time representing the firm, which was acted upon in good faith by William H. Kern, he was entirely justified in selling for that price. [In any event he was not held to the duty of obtaining the highest market price. He could not wantonly and recklessly sacrifice any property which he held as collateral, but it was his duty to use diligent effort to obtain a reasonable and fair price ; if he did that, he did his whole duty in the matter.] [6] . . . .

" [On the whole case, if you find that William H. Kern was a creditor of the glue company to the amount of $38,367.87; that he held securities as collateral with power to sell, and sold the glue either before or after the attachment was served upon him, for the best price reasonably to be obtained therefor; that his debt remained unpaid, or not more than fully paid,—his estate is not liable in this action, and your verdict will be for the garnishees.] [6]    If the computation of the interest by counsel is correct, and a balance of $1,178.08 is due the Baeder Glue Company upon the adjustment of the interest account between them, for that amount, your verdict will be against them.    [If the $3,850 paid by Mr. Gilpin in July, 1890, was the property of the Baeder Glue Company, that should be included in your verdict.] [12]    If the glue was held by William H. Kern as collateral, and sold for less than its market value, without a reasonable effort upon his part to obtain a fair price, he is answerable to the plaintiffs for any difference between the price for which it was sold and its market value.    If his real claim against the Baeder Glue Company was only $26,721.87, and he received, as he has testified, $39,640, he is answerable for the difference between these amounts."

Defendant's points were among others as follows:

" 2.  Though at the time the present attachment was served upon him William H. Kern held warehouse receipts for glue belonging to the Baeder Glue Co., stored in New York, such attachment did not prevent him from afterwards delivering the said glue either to said glue company, or to any member thereof, or upon order of said company to any third person.    If there was such delivery there can be no recovery against Kern's estate in this proceeding for the value of such glue so delivered." Refused. [7]

" 3.  If you believe that at the time the attachment execution in this case was served upon William H. Kern the twenty-one hundred and ninety-eight barrels of glue were in the city of New York, where they remained; that they had been pledged with William H. Kern by the Baeder Glue Co. to cover advances by him to it, with power in him to sell at any time to repay such advances; that said glue was actually sold by him to Mr. Salter for $24,000, and that he did not receive more for said glue than $24,000, then the plaintiffs have no right to

make him account to them for more than $24,000, even though Mr. Salter sold such glue for a much larger sum to the Acme Glue Co." Refused. [8]

"4. If the twenty-one hundred and ninety-eight barrels of glue prior to the present attachment were pledged with William H. Kern by the Baeder Glue Co. to cover advances to it by him, with a power to sell the same in repayment, and if that glue was in the state of New York when the attachment was served, and remained there afterwards, then William H. Kern had a right to sell the same, and he is not, in this proceeding, for the benefit of the plaintiff, chargeable with more than he actually received from such sale for said glue." Refused. [9]

"5. An attachment execution in hands of the sheriff of Philadelphia county did not bind goods then situated in the city of New York, though title to said goods was vested in a citizen of Philadelphia. Such citizen served with such attachment execution, in case thereafter he should sell the goods, would be chargeable only with what he should actually receive therefrom. Unless he sold them he was chargeable with nothing under such attachment." Refused. [10]

"6. Even though William H. Kern conspired with the Baeder Glue Company, or with any of the members thereof, fraudulently to conceal the title to goods belonging to such company, situated in the city of New York, he was not, by reason thereof, liable under an attachment execution levied in his hands by the sheriff of Philadelphia county for the value of such goods, unless he sold the same thereafter, and if he did thereafter sell the same, he was only liable to account for the amount actually realized by him from such sale." Refused. [11]

Verdict and judgment for plaintiff for $12,024.19, and that there was in the hands of the garnishee, $15,657.18. The garnishee appealed.

*Errors assigned* were (1–6) rulings on evidence, quoting the bills of exception; (7–12) instructions as above, quoting them.

*John G. Johnson, Bernard Gilpin* with him, for appellant.— The evidence was improperly admitted. The sole question was whether the father was justly entitled to the amount of

the debt he claimed against the firm, and whether he had realized, or was chargeable with, a greater or less sum from the assets pledged with him. Upon this question the acts and declarations of Howard R. Kern, two years after the transfer, threw no light. The intent of the original transfer was immaterial, and could not be inferred from evidence of the latter.

The attachment execution served upon William H. Kern did not bind glue pledged with him which, at the time of the service, was, and continuously thereafter remained, in New York : Noble v. Thompson Oil Co., 79 Pa. 354 ; Childs v. Digby, 24 Pa. 23 ; R. R. v. Pennock, 51 Pa. 244.

There is nothing in Jaffray's Ap., 101 Pa. 583, or in Dreisbach v. Bank, 113 Pa. 554, inconsistent with the above ruling in Pennock v. R. R. These later cases simply hold that manual seizure is not actually required.

The attachment subjected W. H. Kern to no liability to appellee because of the glue which had been pledged with him, unless, before trial, he had sold the same, and, in such event, only to the extent of the actual proceeds realized by the sale.

The attachment execution imposed no duty on W. H. Kern concerning the glue in favor of appellee. If, therefore, he sold the same for a price less than its fair market value he was responsible for this breach of duty or contract as pledgee, not to appellee, but to the Baeder Glue Co.: Girard Fire Ins. Co. v. Field, 45 Pa. 132 ; Selheimer v. Elder, 98 Pa. 158 ; Peebles v. Meeds, 96 Pa. 154 ; Furness v. Smith, 30 Pa. 522 ; Balliet v. Brown, 103 Pa. 546 ; Heath v. Page, 63 Pa. 108.

Notwithstanding the attachment, the Baeder Glue Co. or the members thereof thereafter, were authorized to direct a delivery of the glue to any third person for any price satisfactory to W. H. Kern, or, with his assent, gratuituously.

The arrangement between William H. Kern and J. E. Salter, whatever its real nature, was one which was approved of by H. R. Kern on behalf of the Baeder Glue Co., and was therefore not impeachable by appellee.

With the assent of H. R. Kern, one of the partners of the Baeder Glue Co., W. H. Kern delivered the glue to Salter for the sum of $24,000. He never received a greater sum for the same, and is not liable to account for more than he actually received.

Even though a conspiracy to injure and delay the creditors of the Baeder Glue Co. had. been entered into between that firm and W. H. Kern, anterior to the attachment, which had resulted in a delivery to the latter of glue located in New York, the attachment issued by appellee, at the time of its service, did not bind the glue for any debt owing at that time by Kern to the glue company, by reason of such conspiracy. A subsequent conversion of such goods to Kern's use would not result in a debt covered by such attachment.

There was no evidence which justified the submission to the jury, by the trial judge, of the liability of William H. Kern to account for the $3,850 paid through Hood Gilpin. The money was paid for an illegal consideration, and the firm itself could not have collected it.

*M. Hampton Todd, Henry C. Todd* with him, for appellee.— The evidence was sufficient to show that W. H. Kern was a conspirator with others to defraud the creditors of the glue company: Lowe v. Dalrymple, 117 Pa. 564.

The effect of the service of the attachment was to transfer an equitable title to the surplus value of the glue to the attaching creditor: Roig v. Tim, 103 Pa. 115; Act of June 16, 1836, § 37, P. L. 768; Jaffray's Ap., 101 Pa. 583; French v. Breidelman, 2 Grant, 319; Heath v. Page, 63 Pa. 108; Breading v. Siegworth, 29 Pa. 399; Barr v. King, 96 Pa. 488; Gochenaurs v. Hostetter, 18 Pa. 422; Childs v. Digby, 24 Pa. 23; R. R. v. Pennock, 51 Pa. 244; Act of April 12, 1855, § 1, P. L. 213; Rozelle v. Rhodes, 116 Pa. 129; Heiskell v. Bank, 89 Pa. 155.

The law in the state of New York concerning the effect of the indorsement and delivery of negotiable warehouse receipts and bills of lading is the same as it is in Pennsylvania: Bank v. Kelly, 57 N. Y. 34.

Haughey was undoubtedly liable to the firm for the money paid by him to W. H. Kern. It was a firm asset, and because he paid it to get rid of a criminal prosecution does not change its character. When it was repaid to H. R. Kern's attorney it at once became a firm asset in his hands. It should never have been taken from the firm, and the payment was only a restoration of what had been improperly taken away. It, therefore,

was not H. R. Kern's to pay his debts with, and when it was paid to W. H. Kern it must be held to have been paid in reduction of his claim against the firm.

OPINION BY MR. JUSTICE WILLIAMS, Oct. 1, 1894:

The plaintiff bank was a judgment creditor of the Baeder Glue Company. It caused an attachment execution to be issued upon its judgment and summoned William H. Kern, among others, as a garnishee. He pleaded "nulla bona," and a trial was had upon the issue so raised. The question presented by this issue and actually tried in the court below was whether Kern was indebted to the glue company, or had in his possession any of its property for which he was liable to account. It appeared from the evidence that he had a large demand against the company and had received property belonging to it as collateral security for this demand. The principal item of the property so received by him was a warehouse receipt for about twenty-two hundred barrels of glue stored in the city of New York. He sold the glue for twenty-four thousand dollars to one who within a few days sold it for thirty-two thousand dollars. Three questions were presented upon these facts: First, what was the true amount of the demand held by Kern against the glue company? Second, what amount had he received from the company in securities, or from the sale of collaterals, which was applicable to the payment of the debt due him? Third, did the sums so received by him satisfy his just demands against the company and leave a balance in his hands for which he ought to account? If so, what was the amount of such balance?

These were questions of fact to be determined by the jury upon the evidence, and the learned trial judge submitted them in an impartial charge, and with proper instructions. The verdict is a final disposition of them. But some questions are now raised that do not seem to have figured at the trial, and are pressed with great earnestness as reasons for a reversal of this judgment. Among these is that of the power of a court in this state to seize, or exercise jurisdiction over, property actually situated in another state. We do not understand that any such power was exercised or asserted by the court below. There was no attempt at seizure of the glue stored in the city of New

York, no service on, or notice to the warehouseman. It was
the money in the pockets of the garnishee arising from the sale
of collaterals held by him, and his own bona fides in making
such sales, that the attaching creditor, standing in the shoes of
his debtor, had a right to inquire into.

The glue company could, and in the light of the verdict it is
proper to say that it did, waive or surrender its right to require
an account from William H. Kern; but if this was collusively
done it did not bind the creditors of the company. The holder
of collateral securities is not bound to obtain the highest pos-
sible price for them, but he is bound to the exercise of common
business prudence and of good faith in his management and
conversion of them. His debtor may acquiesce in, and assent
to, his fraudulent conduct for himself, but he cannot bind his
creditors by such acquiescence or consent. They have a right
to demand, what he ought in good conscience to demand, an
account from his creditor for the collaterals placed in his hands.
This disposes of the sixth, seventh, eighth, ninth, tenth and
eleventh assignments of error.

The admission of the testimony of Nagle and Pearce is com-
plained of in the third, fourth and fifth assignments. This tes-
timony was offered as bearing upon the good faith of William
H. Kern in dealing with the warehouse certificates, and as tend-
ing to show collusion between him and his son, who was an of-
ficer and stockholder in the Baeder Glue Co., for the purpose
of covering the assets of the company and placing them be-
yond the reach of creditors. We think it was competent for
this purpose, and the errors assigned to its admission are over-
ruled.

Nor can we assent to the proposition made in the ninth head
of the argument for the appellant, that there was no evidence
that justified the submission to the jury of the liability of Wil-
liam H. Kern, to account for the sum of $3,850 paid through
Hood Gilpin. This money was paid by L. C. Haughey to re-
lieve himself from a criminal prosecution for the embezzlement
of moneys belonging to the Baeder Glue Co. Howard R. Kern
was the prosecutor acting in behalf of the company. A set-
tlement was made with him and the prosecution discontinued
by his leave. The presumption is that what he did as prose-
cutor he did on behalf of the company he represented. He

had no right to sacrifice the company or its just claims for his own private advantage, and if he was base enough to engage to do so, or to permit the prosecution for the embezzlement of the money of the company to be discontinued in consideration of a bribe paid to him as an individual, he ought not to be heard to allege his own turpitude. The money paid should go, where it of right ought to go, to the party whose money was embezzled and whose officer conducted the prosecution. We see no error in this record that requires us to reverse the judgment, and it is now affirmed.

MR. JUSTICE MITCHELL dissented.